FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

2014 SEP -4 P 2: 17

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| DARRELL L. CRAPPS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action File No.: 1:14CV1138-LD-IDD |
| v. | ) |
| | ) |
| WC HOLDING, INC., | ) |
| SENTEL CORPORATION, and | ) |
| RUSSELL T. WRIGHT, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

Plaintiff Darrell L. Crapps hereby files this Complaint for Damages and Declaratory Judgment against Defendants WC Holding, Inc., Sentel Corporation (collectively, with WC Holding, the "Companies"), and Russell T. Wright. In support of his position, Crapps states as follows:

### Introduction

1.     Crapps and Wright have been friends for nearly 30 years and business partners in a number of ventures for nearly 15 years. More recently, they co-founded WC Holding, which owns and operates Sentel. In recent months, Wright, in his individual and corporate capacity, has engaged in a bad faith and unlawful campaign against Crapps in an effort to wrongfully remove him from his position at the Companies. As such, Crapps was left with no choice but to file this Complaint.

### Jurisdiction/Venue

2.     Crapps is a resident of Miami, Florida.

1

3.      WC Holding is a Delaware corporation with its principle place of business located at 1101 King Street, Suite 550, Alexandria, VA 22314. It can be served via its registered agent, The Corporation Trust Company, located at 1209 Orange Street, Wilmington, Delaware 19801.

4.      Sentel is a Delaware corporate with its principal place of business located at 1101 King Street, Suite 550, Alexandria, VA 22314. It can be served via its registered agent, CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

5.      Wright is a resident of Lorton County, Virginia. He can be served at his personal residence located at 11197 Gunston Road, Mason Neck, Virginia 22079.

6.      Jurisdiction and venue in this Court are proper under 28 U.S.C. §§ 1331, 1367, and 1391.

7.      Jurisdiction and venue in this Court are also proper under 28 U.S.C. §§ 1332 and 1391, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

Factual Background

I.    Formation of WC Holding

8.      WC Holding was co-founded by Crapps and Wright in 2007. The company provides logistic support, information technology, and engineering services through its wholly-owned subsidiary, Sentel.

9.      On May 16, 2007, Wright was issued 1,000 shares of WC Holding common stock, which constituted 100% of the outstanding and authorized stock of the company. Wright subsequently exchanged half of the common stock to Crapps.

10.     In connection with the exchange, Wright asked Crapps to execute certain documents so that Wright could avoid various gift tax consequences associated with the transaction. To that end, the parties executed a Stock Purchase Agreement dated June 2, 2007 (the "Stock Purchase Agreement") listing a purchase price of $7,500,000 (the "Purchase Price") for the 500 shares. See Stock Purchase Agreement dated June 2, 2007, a copy of which is attached as Exhibit A.

11.     At Wright's request, Crapps also executed a Secured Non-Negotiable Promissory Note (the "Promissory Note") in the principal amount of the Purchase Price bearing interest at the rate of 4.64% compounded annually with a maturity date of July 2, 2014. See Secured Non-Negotiable Promissory Note dated July 2, 2007, a copy of which is attached as Exhibit B. Lastly, Crapps executed a Pledge Agreement stating that his 500 shares would serve as security for the Promissory Note. See Pledge Agreement dated July 2, 2007, a copy of which is attached as Exhibit C.

12.     According to Wright, the Promissory Note, Pledge Agreement, and Stock Purchase Agreement were executed as mere formalities for gift tax avoidance purposes. Wright assured Crapps that he would never seek to collect on the Promissory Note or foreclose on Crapps's shares.

13.     Wright also made clear through his actions and representations that Crapps would never be divested of his ownership interest and that they would remain co-owners for the duration of the company's business operations absent them mutually agreeing otherwise. Given their nearly 30 years of friendship, Crapps had no reason to know that Wright was actually scheming to take advantage of him.

14.     Had Crapps known of Wright's ultimate intent, he would have never accepted the shares from Wright.  Nor would he have executed the Stock Purchase Agreement and related documents.

II.     Crapps's Role at the Companies

15.     In good faith, Crapps proceeded to manage the Companies while Wright remained the subject of a six-year non-competition agreement that required him to refrain from having any significant role in either of the Companies.

16.     Crapps was designated as WC Holding's President, Secretary, and Treasurer. He was also designated as Sentel's President, CEO, and as a board of director member.

17.     Crapps was primarily responsible for the day-to-day operations of the Companies until Wright's non-competition agreement expired in 2013. As a result of Crapps's oversight, the Companies experienced exponential growth, increasing the net worth of Wright by millions of dollars while he remained subject to his non-compete.

18.     Specifically, between 2007 and 2013, Crapps grew the Companies from approximately $40,000,000 in revenue to approximately $100,000,000.  A recent valuation establishes the value of WC Holding's stock at more than $25,000,000 (the "Valuation").

III.     Deterioration of the Parties' Business Relationship

19.     Once Wright's non-competition agreement expired in 2013, he inexplicably began to counter decisions made by Crapps and insist that he be vested with ever-increasing managerial control.  He was seemingly insulted by all of the recognition Crapps was receiving due to his success in running the company during the past six years.

20.     To prevent such disputes and to clarify their roles, in early 2013, Crapps and Wright began the process of negotiating a long overdue Shareholders Agreement. See Shareholder Agreement, a copy of which is attached as Exhibit D. Wright, however, asked that they not execute the agreement until his divorce was finalized as a favor to him, a favor that Crapps granted. In retrospect, it is likely that Wright never intended to execute the agreement. Instead, he used his divorce for purposes of delay until he could strip Crapps from his duties and remove him from his positions.

21.     In another attempt to take advantage of their friendship, Wright asked Crapps to sell his house to his estranged wife. Crapps originally purchased the house from Wright and his wife, but could not agree to sell it back for various reasons. Crapps's refusal to do so greatly offended Wright. He began to act out his offense regarding this and other issues by taking steps to destroy everything Crapps had worked so hard at building.

22.     Wright first used the documents executed in connection with the exchange of stock in an attempt to bully Crapps out of the company. Despite the execution of the documents being a mere formality, by letter dated July 2, 2014, Wright demanded that Crapps pay the Purchase Price, along with all accrued interest, for a total amount of $10,371,655.87 (the "Demand Letter"). See Demand Letter from Wright to Crapps dated July 2, 2014, a copy of which is attached as Exhibit E.

23.     In response and in an effort to save his relationship with Wright, Crapps offered to execute an amendment to the Promissory Note and explore various means by which the Promissory Note might be satisfied. See Letter from Crapps to Wright dated July 7, 2014, a

copy of which is attached as Exhibit F. At all times, Crapps expressed an interest in maintaining his ownership interest in the Companies.

24.     Going a step further, Wright tried to remove Crapps from the Companies all together.     To begin, Crapps received a termination letter on July 21, 2014, which was subsequently rescinded and replaced with a request that Crapps take a leave of absence. See Letter and Emails dated July 21, 2014 to Crapps, copies of which are attached as Exhibit G.

25.     Approximately two weeks later, Crapps received a second termination letter dated August 7, 2014, whereby his salary, building access, access to financial information, health insurance coverage, email address, and mobile phone service were all cancelled. See Letter dated August 7, 2014 between Sentel Human Resources and Crapps, a copy of which is attached as Exhibit H.

26.     In another effort to resolve the dispute between them amicably, Crapps complied with Wright's request that he not report to the office or communicate with employees and vendors, despite his right to do so as an officer and director. Wright made this request under the guise of saying it would facilitate a quick resolution of their dispute. Crapps has since made numerous documented attempts, with and without counsel, to reach a resolution that did not require the filing of a civil action. To date, Wright has ignored all of Crapps's attempts, while at the same time continuing to run the Companies without the majority required for making business decisions.

27.     Wright has since filed a frivolous lawsuit against Crapps claiming breach of the Promissory Note.     Viewed together, Wright's fraud, defamation, wrongful attempts at termination and removal, false accusations, and baseless lawsuit establish a deliberate plan to

6

fraudulently induce Crapps to work for six years to build the Companies while Wright was subject to a non-competition agreement, only for Wright to snatch back control of the Companies within months of the expiration of his non-compete.

## COUNT I:
## SECURITIES FRAUD

28.     Crapps hereby incorporates paragraphs 1 through 27 above and realleges them as though fully set forth herein.

29.     Wright, directly or indirectly, in connection with his exchange of securities to Crapps, by the use of any means or instrumentality of interstate commerce or of the mails, knowingly or with reckless disregard for the truth: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud and deceit upon Crapps.

30.     Wright acted knowingly or severely recklessly in his actions and inaction. By reason of the foregoing, Wright has violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II:
## FRAUD

31.     Crapps hereby incorporates paragraphs 1 through 30 above and realleges them as though fully set forth herein.

32.     At the time of WC Holding's formation, Wright made a number of misrepresentations.

7

33.     These representations were false and Wright knew the falsity of these statements at the time they were made.

34.     Upon information and belief, Wright never intended to honor Crapps's position as the co-owner of the Companies, along with his role as an officer and director of the same. Instead, Wright set out to induce Crapps to run the Companies for Wright until his non-competition agreement expired, at which point in time he sought to garner complete control.

35.     Crapps relied on the representations of Wright and would not have invested substantial time and resources into the Companies otherwise.

36.     Wright made these representations with the intent to defraud Crapps, all with malice.

37.     Crapps has been injured as a result of Wright's misrepresentations.

38.     Wright's actions were malicious, fraudulent, and oppressive, justifying an award of punitive damages so that he will not engage in such conduct in the future.

### COUNT III
### VIOLATION OF RICO 18 U.S.C. § 1962(C)

39.     Crapps hereby incorporates paragraphs 1 through 38 above and realleges them as though fully set forth herein.

40.     This claim is asserted by Crapps against the Defendants as a violation of 18 U.S.C. § 1962(c). Defendants violated 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the affairs of an enterprise through a pattern of racketeering as a means to defraud Crapps and make secret profits for themselves. Under Section 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Any person whose business or property has been injured by reason of this statute may recover damages from each person who caused the injury.

41.     The term "enterprise" incudes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals or corporations associated in fact, although not a legal entity, engaged in interstate commerce, or whose activities affect interstate commerce. In this case, Defendants constitute an enterprise engaged in or whose activities affect interstate or foreign commerce. Defendants are employed by or associated with the enterprise and directed its affairs.

42.     Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Crapps.

43.     Section 1961(5) defines a "pattern of racketeering" as "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." The acts must be related and continuous to form a "pattern of racketeering." "Related" is defined as "acts that have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events." Continuity can be shown by alleging a closed-ended scheme, consisting of a series of related predicate acts extending over a substantial period of time, or an open-ended scheme. In order to properly allege an open-ended scheme, the plaintiff must establish the "threat of continuity." Two important factors in alleging and establishing

"continuity" are (1) the duration of the alleged misconduct; and (2) a threat of continuing criminal conduct.

44.     Wright's fraud, defamation, wrongful attempts at termination and removal, false accusations, and baseless lawsuit establish a deliberate plan to fraudulently induce Crapps to work for six years to build the Companies while Wright was subject to a non-competition agreement, only for Wright to snatch back control of the Companies within months of the expiration of his non-compete. Defendants, through Wright, never intended to fulfill their promises and obligations to Crapps.

45.     Wright, individually and as a representative of the Companies, misrepresented to Crapps the nature of his transfer of WC Holding shares to Crapps and the reason for the documents executed in connection with said transfer.  Wright also falsely told Crapps that he would never be divested of his ownership interest in the company and that they would remain co-owners for the duration of its business operations.

46.     Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of mail and wire fraud pursuant to 18 U.S.C. § 1341 and § 1342.  Mail and wire fraud constitute conduct within the meaning of "racketeering activity," and the acts described herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

## COUNT IV:
### DEMAND FOR PAYMENT UNDER
### VIRGINIA CODE ANNOTATED § 8.9A-615(D)

47.     Crapps hereby incorporates paragraphs 1 through 46 above and realleges them as though fully set forth herein.

48.     The Stock Purchase Agreement and Promissory Note are governed by the laws of the State of Virginia. See Stock Purchase Agreement ¶ 9 and Promissory Note ¶ 11.

49.     Under Virginia law, in the event of a borrower's default and subsequent enforcement of a lender's security interest, the borrower has a right to the surplus associated with the disposition of a security interest that secures payment or performance of the obligation. See Virginia Code Annotated § 8.9A-615(d).

50.     Per the Valuation, Crapps's 500 shares of common stock pledged as security for the Promissory Note are valued at $12,500,000, which is $2,128,344.13 more than the amount Wright claims is due on the Promissory Note per his Demand Letter (the "Surplus").

51.     As such, the Promissory Note is over-collateralized, giving rise to the Surplus (i.e., the value of the shares minus the value of the amount due on the Promissory Note).

52.     Wright has issued a letter calling the Promissory Note and seeking to foreclose on the shares.

53.     In the event the shares are foreclosed upon, Wright is responsible for paying Crapps the Surplus.

## COUNT V:
## VIOLATION OF COMPANY BYLAWS

54.     Crapps hereby incorporates paragraphs 1 through 53 above and realleges them as though fully set forth herein.

55.     Here, Wright failed to comply with the terms of the Companies' Bylaws by attempting to remove Crapps from his officer and director positions without complying with the requirements of the Bylaws.

56.     Accordingly, Wright's attempt to remove Crapps is void as a matter of law.

57.     Crapps asks that the Court enter a judgment declaring as much and establishing his right to continue as an officer and director of the Companies.

58.     A judicial determination resolving this actual controversy is necessary and appropriate at this time.

## COUNT VI:
## BREACH OF FIDUCIARY DUTY

59.     Crapps hereby incorporates paragraphs 1 through 58 above and realleges them as though fully set forth herein.

60.     Wright is a director of WC Holding and an officer of Sentel.

61.     To discharge his duties, Wright, as an officer and director of the Companies, was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Companies.

62.     By virtue of his positions of control over the Companies, including but not limited to, providing administrative, leadership, and financial support to the Companies, and by virtue of the confidence reposed by the Companies and Crapps in Wright, Wright owed the Companies and Crapps all duties of a fiduciary, including, *inter alia*, the duties of fair dealing, good faith, loyalty, and care.

63.     Additionally, Wright was and is required to act in furtherance of the best interests of the Companies and Crapps so as to benefit all shareholders equally and not in furtherance of his personal interest or benefit.

64.     Wright, because of his positions of control and authority as a director and officer of the Companies, was able and did, directly or indirectly, exercise control over the wrongful acts set out in this Complaint.

12

65.     Wright's actions concerning Crapps as described herein are tantamount to a breach of his fiduciary duty.

66.     As a result of Wright's breach of fiduciary duty, Crapps has suffered damages in the amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Crapps prays for judgment against Defendants as follows:

a)      Damages in an amount to be proven at trial;

d)      A declaratory judgment holding that the attempts to remove Crapps from the Companies are ineffective as a matter of law;

e)      Costs and fees incurred by Crapps;

f)      Attorneys' fees to the extent allowed for by law; and

g)      For such other and further relief as the Court may deem just and proper.

September 4, 2014.

Respectfully submitted,

O'Kelly E. McWilliams III (EDVA Bar. No. 36137)
Brian A. Scotti (EDVA Bar No. 74510)
Gordon & Rees LLP
700 12th Street, N.W., Suite 1050
Washington, D.C. 20005
omcwilliams@gordonrees.com
bscotti@gordonrees.com
Main Phone:  (202) 399-1009
Facsimile: (202) 800-2999

*Counsel for Plaintiff*